UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

MERWIN COLEMAN,

     Plaintiff,

     v.                              Case No. 3:19-CV-129 JD

NICK BAKER,

     Defendant.

## OPINION AND ORDER

In 2017, Officer Nick Baker shot at Merwin Coleman about eighteen times as Mr. Coleman drove toward Officer Baker at a high speed while swerving. Mr. Coleman was fleeing nearby gunshots fired by a third party. One shot fired by Officer Baker grazed Mr. Coleman, but he was otherwise unharmed. Mr. Coleman brought this suit, alleging Officer Baker acted unreasonably in exercising deadly force against him, violating his Fourth Amendment right against unreasonable seizure.[1] Officer Baker moved for summary judgment, arguing that his use of force was reasonable under the circumstances and that he should be granted qualified immunity. The Court grants Officer Baker's motion for summary judgment, finding there is no dispute of material fact. The Court analyzes the two prongs of qualified immunity in reverse order, first holding Officer Baker was entitled to qualified immunity because the unlawfulness of his conduct was not clearly established, then finding Officer Baker's use of force was reasonable.

---

[1] This action was initially brought *pro se*; as such, Mr. Coleman's First Amended Complaint was screened by the Court. (DE 22; DE 26.) The Court allowed Mr. Coleman to proceed on one claim for excessive force against Officer Baker in his individual capacity. (DE 26.) Mr. Coleman's attempts to replead screened claims were denied. (DE 71; DE 111.) Mr. Coleman later obtained counsel. (DE 118.) Cursory references to other potential claims in Mr. Coleman's response brief do not relate to any claims at issue in this suit.

### A.  Factual Background

The following facts are adopted from Mr. Coleman's Response to Defendant's Statement of Material Facts (DE 141) and video evidence submitted by Officer Baker (DE 137). At about 3:00 A.M. on July 23, 2017, Michigan City police were involved in a vehicle pursuit that ended near Mr. Coleman's residence. (DE 141 ¶ 1.) Several officers eventually parked at the 400 block of Pleasant Avenue and conducted an investigation related to the pursuit. Multiple officers and civilians stood in and near the road on Pleasant Avenue and in the surrounding blocks. (*Id.* ¶¶ 34–35.) Pleasant Avenue is a narrow one-way residential street; on that night, cars were parked on both sides. (*Id.* ¶¶ 2; 64.) The speed limit on Pleasant Avenue is 30 miles per hour. (*Id.* ¶ 33.) It was a hectic night: within the hour, officers received calls of multiple shots fired in the area. (*Id.* ¶ 3.) Officers also received information from dispatch that a maroon SUV was driving recklessly in the area and had nearly run over a pedestrian. (*Id.* ¶ 4.)

Around 3:45 A.M., Mr. Coleman received a call from his girlfriend reporting that shots had been fired at their house. (*Id.* ¶ 84.) Mr. Coleman, who was then at CVS, promptly returned home. (*Id.* ¶ 84.) He later saw two men outside his house on the sidewalk. (*Id.* ¶ 87.) One of the men pulled out a gun but did not fire at Mr. Coleman. (*Id.* ¶ 88.) Mr. Coleman was afraid, and he quickly drove his maroon SUV toward the officers he had previously observed in the neighborhood, intending to ask them for help. (*Id.* ¶¶ 84–90.) He was driving rapidly, causing one officer to step out of the road to avoid being hit. (*Id.* ¶ 7.) Mr. Coleman parked and reported to the officers that gunshots had been fired at his house. (*Id.* ¶ 94.) One officer told Mr. Coleman to go home and wait for the police there. (*Id.* ¶ 95.) Mr. Coleman heeded the officer's instructions and went home. (*Id.* ¶ 99.) At about this time, Officer Baker arrived on the scene. (*Id.* ¶ 8.) He parked his patrol vehicle and spoke to some other officers. (*Id.* ¶ 14.) Though he

was present for part of Mr. Coleman's interaction with officers, he did not interact with Mr. Coleman himself. (*Id.* ¶¶ 97–98.) As all of this was happening, a woman arrived, identified herself, and reported to the officers that Mr. Coleman had nearly struck her with his vehicle at an intersection two blocks away. (*Id.* ¶ 20.)

She was not able to finish her complaint, as she was interrupted by the sound of six third-party gunshots. (*Id.* ¶ 46.) Officer Baker heard the shots, called out, "Shots fired!" on his radio, and took cover. (*Id.* ¶¶ 22–26.) Another six or more gunshots were heard. (*Id.* ¶ 25.) At this time, Mr. Coleman was several blocks away, parked outside his home. (*Id.* ¶ 99.) Hearing the gunshots, he rapidly drove to the area where he knew the officers were, hoping to reach safety. (*Id.* ¶¶ 27; 116.) In order to dodge the bullets, Mr. Coleman was driving fast, at least 54 miles per hour. (*Id.* ¶ 60.) Witnesses in the area described Mr. Coleman's vehicle as "flying by at a high rate of speed." (*Id.* ¶ 32.) He was also swerving from one side of the road to the other and "driving erratically." (*Id.* ¶¶ 28–29.) At one point, Officer Baker observed the vehicle's tires leave the road before Mr. Coleman again swerved, almost striking at least one other vehicle. (*Id.* ¶ 28.) Officer Baker was standing in the road in front of the driver's side headlight of his patrol car. (*Id.* ¶ 38.) The area was "full of police officers and civilians." (*Id.* ¶ 34.)  Mr. Coleman was driving toward Officer Baker, and Officer Baker believed he or one of the nearby people (including other police officers, a tow truck driver, and civilians) would be hit. (*Id.* ¶¶ 37–38.) The woman who reported that Mr. Coleman nearly hit her also remained in the immediate vicinity on foot. (*Id.* at ¶ 70.) Officer Baker suspected additional people remained at the intersection of Rose and Pleasant, a half block north of his position in the direction Mr. Coleman was driving, as he had witnessed them in the area only seconds before. (*Id.* at ¶ 35.) As the SUV approached, Officer Baker jumped out of the road and to the passenger side of his patrol car. (*Id.*

¶ 39.) From this position, it would still be possible for a vehicle to hit Officer Baker. (*Id*. ¶¶ 64–66.) Ongoing gunfire continued, and it was not clear to Officer Baker who was firing. (*Id.* ¶ 31.)

When Mr. Coleman's vehicle was 300 feet away, Officer Baker began shooting at him, ultimately firing seventeen or eighteen shots. (*Id*. ¶¶ 57–59.) Three or four seconds elapsed between the time at which Officer Baker began shooting and Mr. Coleman's vehicle passing him. (*Id*. ¶ 57.) Some shots were fired before Mr. Coleman passed Officer Baker, and an indeterminable number were fired after. (*Id*. ¶ 56.) Several of these shots hit the body of Mr. Coleman's vehicle and one shot grazed his left arm. (*Id*. ¶ 77.) After passing Officer Baker, Mr. Coleman swerved again, then exited the road and crashed into a nearby tree. (*Id*. ¶ 43.) Mr. Coleman maintains he crashed into the tree on purpose to play dead. (*Id*. ¶ 43.) The entire incident, from the original third-party gunshots to the car's coming to rest in the tree, occurred in less than thirty seconds. (*Id*. ¶ 72.).

Mr. Coleman was then arrested and taken to the hospital. He suffered a minor graze wound to his left arm and a head injury. (*Id*. ¶¶ 77–79.) His medical bills related to the incident totaled about $9,000. (*Id*. ¶ 113.) A Michigan City Police Department panel found that Officer Baker had violated its policy regarding the use of deadly force and recommended his termination. (*Id*. ¶ 122.) Officer Baker thereafter resigned. (*Id*. ¶ 125.)

### B.  Standard of Review

Summary judgment is warranted when the evidence viewed in a light most favorable to the non-moving party presents no genuine issue of material fact, such that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). When deciding a motion for summary judgment, all disputed issues of fact are to be resolved in favor of the non-moving

party. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 255 (1986). A court may consider

videotape evidence on a motion for summary judgment. *Scott v. Harris*, 550 U.S. 372, 380

(2007). For a dispute of fact to be material, it must be "outcome-determinative under the

applicable law." *Smith v. Severn*, 129 F.3d 419, 427 (7th Cir. 1997). "Thus, facts not outcome

determinative, though in dispute, may still permit the entry of summary judgment." *Id*.


### C.  Standards for Excessive Force and Qualified Immunity

The Fourth Amendment protects the right of the people against unreasonable searches and

seizures. U.S. Const. amend. IV. A person is seized when they are intentionally shot by police,

regardless of whether they are physically stopped. *Torres v. Madrid*, 141 S. Ct. 989, 999 (2021).

"[C]laims that law enforcement officers have used excessive force—deadly or not—in the course

of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the

Fourth Amendment and its 'reasonableness' standard." *Graham v. Connor*, 490 U.S. 386, 395

(1989). This inquiry involves "a careful balancing of the nature and quality of the intrusion on

the individual's Fourth Amendment interests against the countervailing governmental interests at

stake." *Id.* at 396. The "'reasonableness' of a particular use of force must be judged from the

perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."

*Id*. The "'reasonableness' inquiry in an excessive force case is an objective one: the question is

whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances

confronting them, without regard to their underlying intent or motivation." *Id*. at 397. An

officer's use of deadly force must be reasonable. *Tennessee v. Garner*, 471 U.S. 1, 11 (1985).

"Where the officer has probable cause to believe that the suspect poses a threat of serious

physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force." *Id*.

The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). An officer is entitled to qualified immunity unless both of the following conditions are met: (1) the facts alleged, taken in the light most favorable to the victim, show that the officer violated a constitutional right and (2) the right was clearly established at the time of injury. *Payne v. Pauley,* 337 F.3d 767, 775 (7th Cir. 2003). Courts look to the "objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken." *Pearson*, 555 U.S. at 244. Under the first prong, the court decides whether the facts shown make out a violation of a constitutional right. *Id*. at 232. This is a question of law. *Smith v. Finkley*, 10 F.4th 725, 734 (7th Cir. 2021). Under the second prong, the plaintiff bears the burden of showing a clearly established right was violated. *Forman v. Richmond Police Dep't*, 104 F.3d 950, 957–58 (7th Cir. 1997). To meet his burden, a plaintiff must identify a "closely analogous case" establishing the right, or the facts must present an obvious constitutional violation. *Id*. at 958. "That is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in light of pre-existing law the unlawfulness must be apparent." *Becker v. Elfriech*, 821 F.3d 920, 925 (7th Cir. 2016). The right must be more specific than the right to be free from excessive force in a general sense; the illegality of the conduct must obviously flow from the right. *Becker*, 821 F. 3d at 928. A constitutional violation will be obvious if the "defendant's conduct was so egregious and unreasonable that no reasonable official could have thought he

was acting lawfully." *Reed v. Palmer*, 906 F.3d 540, 547 (7th Cir. 2018). Even if the constitutional violation is obvious, a plaintiff must point to "a general constitutional rule already identified in the decisional law [that] applies with obvious clarity to the specific conduct in question." *Cibulka v. City of Madison*, 992 F.3d 633, 640 (7th Cir. 2021).


**D. Discussion**

The Court finds itself in an unusual position. Excessive force cases usually present disputes of material fact; thus, summary judgment is rarely appropriate. *Abdullahi v. City of Madison*, 423 F.3d 763, 773 (7th Cir. 2005). However, in this case, Mr. Coleman's Response to Defendant's Statement of Material Facts (DE 141) admits almost every fact as alleged by Officer Baker and disputes only a few immaterial qualitative facts.[2] Though it is atypical for litigants to agree to such a high degree at this stage, the Court adopts the undisputed facts. *See Waldridge v. American Hoechst Corp.* 24 F.3d 918, 922 (7th Cir. 1994). In addition, Mr. Coleman devotes his entire six-page response brief to a single, meritless defense to summary judgment, thereby waiving other arguments potentially capable of defeating summary judgment. *See Nichols v. Michigan City Plant Plan. Dep't*, 755 F.3d 594, 600 (7th Cir. 2014) ("The non-moving party waives any arguments that were not raised in its response to the moving party's motion for summary judgment.") Under these unique circumstances, the Court finds Officer Baker was entitled to qualified immunity for the entire use of deadly force. The Court also holds the use of force was reasonable because a reasonable officer in his position would feel his life and the lives of others were in imminent danger.

---

[2] For example, while admitting that Mr. Coleman was swerving to the degree that his tires came off the road and that he almost hit cars and a civilian, he disputes characterizing the swerving as "wide" and emphasizes that he was trying to keep his eyes on the road. (DE 141 at ¶¶ 29–31; 56.)

### *(1) Officer Baker is entitled to qualified immunity.*

The Court finds Officer Baker is entitled to qualified immunity. To determine whether an officer is entitled to qualified immunity, the Court asks whether (1) the facts alleged, taken in the light most favorable to the victim, show that the officer violated a constitutional right and (2) whether the right was clearly established at the time of injury. *Payne*, 337 F.3d at 775. A court may analyze either of these prongs first. *Pearson,* 555 U.S. at 236. In this matter, the Court begins by analyzing the second prong, finding that even if the force employed by Officer Baker was excessive, Mr. Coleman did not meet his burden to show it was clearly established that his actions constituted unreasonable force at the time of the injury. Though Mr. Coleman waived the argument that the use of force was excessive by failing to raise it, the Court also finds the use of force was not unreasonable under the circumstances.

Under qualified immunity, the right at issue will be clearly established if it is settled law or if it is an obvious case for which a body of relevant case law is not needed. *D.C. v. Wesby,* 138 S. Ct. 577, 591 (2018). Plaintiff bears the burden of identifying an analogous case establishing the right. *Forman*, 104 F.3d at 957–58. Mr. Coleman does not identify any analogous case clearly establishing the right and instead argues the constitutional rule against excessive force applies "with obvious clarity to the specific conduct in question." *United States v. Lanier*, 520 U.S. 259, 271 (1997); (DE 140 at 4). Mr. Coleman rests his entire case on the obviousness of the violation. Because he does not present other arguments capable of defeating summary judgment, he has waived them. *See De v. City of Chicago,* 912 F. Supp. 2d 709, 734 (N.D. Ill. 2012). Mr. Coleman

makes three arguments for obviousness, all of which fail.[3] He suggests two rules that he claims establish obvious constitutional rights: first, that officers cannot use deadly force against those fleeing to, rather than away from, police; and second, that officers cannot entrap a person and then seize them based on that entrapment. The former is precluded by circuit precedent and the latter does not apply to Mr. Coleman because he was not entrapped. Finally, he argues that his right against being shot at under the circumstances was obvious precisely because there is an absence of governing precedent, relying on the idea that "the most obvious case never arises." (DE 140 at 5.) This argument fails because pointing to a lack of identical precedent is inadequate to meet a plaintiff's burden and establish the right and because analogous precedent existed.

   (a) *An officer may seize someone sufficiently dangerous regardless of whether they "flee to" the police.*

   Mr. Coleman suggests that it is obvious that a person fleeing toward police has a right to be free of unreasonable seizure. He does not particularize this generic concept and does not concern himself with how officers may perceive such flight toward them.  Mr. Coleman states he was not under arrest or fleeing arrest at the time of the seizure, and his conduct in driving recklessly constitutes only a misdemeanor under Indiana law. (DE 140 at 1 n.3; 4.) He argues this lack of culpability renders the constitutional violation obvious and suggests a rule that officers cannot use deadly force "against a person fleeing to the police rather than from them." (DE 140 at 4–5.)

------

[3] Mr. Coleman also presents as evidence that Officer Baker violated the Michigan City Police use of force policy. This is not relevant to the Fourth Amendment inquiry. *Thompson v. City of Chicago*, 472 F.3d 444, 454 (7th Cir. 2006) ("[T]he violation of police regulations or even a state law is completely immaterial as to the question of whether a violation of the federal constitution has been established."). The parties did not submit a finding by the panel explaining how the policy was violated, but the Court notes a significant difference between the Michigan City Police Department policy and the constitutional standard. Policy Number 32, section V(B)(2) reads: "Firearms shall not be discharged at a moving vehicle unless a person in the vehicle is immediate threatening the officer or another person with deadly force by means other than the vehicle. The moving vehicle itself shall not presumptively constitute a threat that justifies an officer's use of deadly force." (DE 142 at 4.) This differs from the constitutional standard, where "a car can be a deadly weapon." *Brosseau v. Haugen*, 543 U.S. 194, 200 (2004).

This is patently wrong. Mr. Coleman's suggested rule neglects to consider the danger presented by a person to police and others; instead, it differentiates only by whether the seized person was under arrest, fleeing, or the subject of an investigatory stop prior to the seizure. (DE 140 at 2.) Under Mr. Coleman's proposed rule, the police cannot use deadly force against a person, no matter how dangerous, unless they were previously under some form of suspicion or investigation. This rule is not workable because the result is absurd; a reasonable officer is not required to allow himself to be hit by a car unless he knows the driver to have prior culpability. *Horton v. Pobjecky*, 883 F.3d 941, 952 (7th Cir. 2018) ("A reasonable officer need not risk his life and the lives of others" where he perceived the person as "posing an imminent threat of death or serious physical injury").

Moreover, Mr. Coleman's suggested rule does not comport with qualified immunity's requirement that courts consider the facts and circumstances as known to the officer. *See Kelly v. Sines*, 647 F. App'x 572, 576 (6th Cir. 2016); *see also Finkley*, 10 F.4th at 738. An officer's use of force need only be reasonable in light of the facts a reasonable officer would have known and reasonably perceived at the time of the seizure. *Graham*, 490 U.S. at 396–97. But officers are not mind readers, and the Court does not wish to impose supernatural duties upon them. For his part, Mr. Coleman does not suggest any method capable of enabling an officer to accurately discern a person's subjective motivation in approaching police dangerously, nor can the Court envision one. *See Elliott v. Leavitt*, 99 F.3d 640, 643 (4th Cir. 1996) (rejecting argument that plaintiff's subjective intent in pointing gun at police was relevant to inquiry and noting "it is not clear what other evidence of intent" would be required). The difficulty of determining a person's subjective intent renders it an ill fit for the split-second decisions officers face. In contrast, a seized person's actions are properly considered. *See Abbott v. Sangamon Cnty., Ill.*, 705 F.3d 706, 729 (7th Cir.

2013) (seized person's level of resistance decisive in qualified immunity analysis). Accordingly,
qualified immunity does not—and could not—turn on the subjective intent of the person seized.

Furthermore, Mr. Coleman's proposed standard for finding an obvious violation has no basis
in the law. *See Cibulka*, 992 F.3d at 640. Courts finding obvious violations in other cases note
their findings are supported by well-established related principles of law. *Cf. Brokaw v. Mercer
Cnty.*, 235 F.3d 1000 (7th Cir. 2000) (supporting finding of obvious violation of child's familial
rights with case law establishing similar rights in other contexts); *Taylor v. Ways*, 999 F.3d 478,
492 (7th Cir. 2021) (illegality of race discrimination in the employment context could support
finding of obvious race discrimination violation). In contrast, case law has foreclosed Mr.
Coleman's supposedly obvious violation. To begin with, the Supreme Court rejected Mr.
Coleman's danger-agnostic framework in *Tennessee v. Garner*, 471 U.S. 1, 20 (1985). In
*Garner*, the Court disavowed the common-law rule, which justified deadly force if a felony had
been committed, and instead required the force to be justified based on the totality of the
circumstances, including dangerousness of the suspect. *Id*. In rejecting this distinction, *Garner*
noted that many misdemeanors, such as drunken driving, are more dangerous than felonies. *Id*. at
14. Thus, Mr. Coleman's suggested rule for obviousness has been squarely renounced by this
country's highest court for nearly forty years. Moreover, a rule predicated on flight alone would
be contrary to circuit precedent. The Seventh Circuit allows police to deploy deadly force if they
believe the person "poses a threat of serious physical harm, either to the officer or to others, *or*
committed a crime involving the infliction or threatened infliction of serious physical harm and
is about to escape." *Muhammed v. City of Chicago*, 316 F.3d 680, 683 (7th Cir. 2002) (emphasis
added). In our circuit, danger alone is sufficient to justify lethal force; this renders Mr.
Coleman's "flee to" argument irrelevant. Finally, the Supreme Court has addressed use of force

against less culpable persons in *Scott v. Harris*, 550 U.S. 372, 385 (2007) (holding use of deadly force was reasonable where reckless driver posed an "actual and imminent threat to the lives" of innocent bystanders). Rather than adopting a bright line rule prohibiting use of force, the Court weighed the seized person's culpability as a factor in the totality of the circumstances. *Id.* Thus, Mr. Coleman's proposed "flee to" rule is legally untenable and insufficient to support the obviousness of the alleged violation.

*(b) Mr. Coleman was not entrapped by the officers' conduct.*

Mr. Coleman suggests a second argument for the obviousness of the violation. He states the officers' directive that he return home after his initial complaint about gunfire constituted entrapment and that he was forced to later drive recklessly. (DE 140 at 5.) Mr. Coleman cites *Vodak v. City of Chicago* as support. 639 F.3d 738 (7th Cir 2011). In *Vodak*, the court found an unreasonable seizure because officers arrested protesters for failing to disperse without telling them their protest was without a valid permit, clearly ordering them to disperse, or directing them to an approved path to disperse from the area. *Id*. at 746–47. *Vodak* found this conduct presented an obvious violation because the officers entrapped protesters and unwitting bystanders. *Id*. *Vodak* is clearly distinguishable; Mr. Coleman was not entrapped and was acting of his own accord. Though the neighborhood was certainly a dangerous locale that night, Mr. Coleman was not forced by police to drive to the scene, nor did police instruct him to do so and then change their minds without informing him. In fact, the police told Mr. Coleman to leave the scene, and his later choice to return driving recklessly was of his own volition.

Mr. Coleman implies his swerving and driving at high speed was not only reasonable, but somehow foisted upon him by police. But our circuit precedent only finds actions involuntarily

where compliance was physically impossible, a standard that Mr. Coleman cannot meet. *See Est. of Starks v. Enyart*, 5 F.3d 230, 235 (7th Cir. 1993) (driving car at officer involuntary when the officer jumped in front of the car and there was no time to brake). To begin with, Mr. Coleman was not forced by police to be the subject of third-party gunfire. He argues he was ordered to "return to gunfire" (described alternatively as "the battlefield"), but unlike the officers in *Vodak*—who possessed all information relevant to the entrapment—officers had no knowledge or reason to know that gunfire would resume near Mr. Coleman's house. Further, once gunfire began, Mr. Coleman was not forced to drive recklessly toward the police. First, it is notable that Mr. Coleman's decision to drive recklessly toward the scene was not pursuant to any instructions from the police; in fact, they had previously told him to exit the busy pedestrian area and return home. (DE 141 at ¶ 95.) Second, Mr. Coleman's argument that he was forced to drive recklessly is impossible to square with the undisputed facts. For Mr. Coleman's conduct to be truly involuntary, it must have been done contrary to or without choice. *United States v. Kozminski*, 487 U.S. 931, 937 (1988). But Mr. Coleman had choices other than the single option to drive toward the police at any cost, potentially mowing down others in the process. *Compare Starks*, 5 F.3d at 235 (action is involuntary if other conduct physically impossible). He was at rest in his car near his home several blocks away; upon hearing third-party gunshots, he drove toward the police (and a busy pedestrian area) for protection. One can imagine other courses of conduct available to Mr. Coleman.[4] Indeed, if Mr. Coleman's conduct represented the *only* possible option, one would expect his neighbors, who were subject to the same conditions, to engage in the same behavior. Interestingly, the parties do not report that any of them did. *Compare Vodak*,

---

[4] The Court does not analyze whether Mr. Coleman's conduct was *reasonable*, as only the reasonableness of Officer Baker's actions is relevant to the excessive force inquiry. The Court merely notes that other conduct was *possible*.

639 F.3d 745 (thousands subject to the same conditions behaved similarly as a result of their entrapment). No one, police included, forced him to drive to the scene or to drive recklessly while doing so. This is not a case in which the police seized Mr. Coleman for behavior they had forced upon him; accordingly, *Vodak* does not support Mr. Coleman's argument that the violation was obvious because he was entrapped by police.

(c) *The nonexistence of an identical case is inadequate to establish the right.*

Mr. Coleman's final argument for obviousness is that "the most obvious case never arises." (DE 140 at 5.) This phrase has become common in circuit precedent. *See K.H. Through Murphy v. Morgan*, 914 F.2d 846, 851 (7th Cir. 1990) (positing that officials would not be afforded qualified immunity for selling foster children into slavery due to lack of precedent). However, cases employing this proposition do not rest on it alone but support the obviousness of the violation with applicable principals of well-established law. *See Vodak,* 639 F.3d at 746. Mr. Coleman, on the other hand, implies the absence of an identical case itself evidences the violation's obviousness. Without any other supporting law, Mr. Coleman rests on the non-existence of an identical case itself to establish obviousness. As an initial point, the argument as presented by Mr. Coleman is so underdeveloped and without legal support that the Court could consider it waived. *Bernal v. NRA Grp., LLC,* 318 F.R.D. 64, 77 (N.D. Ill. 2016) (conclusory argument citing no case law is waived).  Nevertheless, because it represents Mr. Coleman's entire argument on summary judgment, the Court will address this argument on the merits. It is not robust or feasible for several reasons.

First, allowing plaintiffs to claim obviousness supported only by lack of identical precedent would present a paradox capable of defeating any qualified immunity argument. As the Seventh

Circuit has written, a closely analogous case is sufficient to establish that the conduct is unconstitutional. *Siebert v. Severino*, 256 F.3d 648, 655 (7th Cir. 2001). As such, holding that the absence of a case directly on point alone is *also* sufficient to clearly establish a right would eviscerate qualified immunity. A plaintiff could prevail on any qualified immunity argument by stating either an analogous case found the officer's actions unreasonable or by merely pointing out that no exactly matching case exists. Heads I win, tails you lose! Such a rule would remove from the set of potential outcomes the option for a nonobvious case in which the right was not clearly established—a fairly common outcome. *See Mullenix v. Luna*, 577 U.S. 7, 12 (2015) ("qualified immunity protects all but the plainly incompetent or those who knowingly violate the law"). This approach is not in accordance with the broad sweep of qualified immunity.

Even if the non-existence of an identical case constituted a workable argument, Mr. Coleman's approach reverses the party's burdens under the qualified immunity inquiry. *See Landstrom v. Illinois Dep't of Child. & Fam. Servs*., 892 F.2d 670, 675 (7th Cir. 1990). Mr. Coleman attempts to assert that his case has never arisen by distinguishing analogous precedent cited by Officer Baker. It is Mr. Coleman's own burden to identify an analogous case or other basis for the right. He cannot simply differentiate analogous cases until there is no universe of cases; that is the opposite of providing a clearly established right.[5] Mr. Coleman's argument that allegedly analogous cases differ too greatly is commonly employed by defendants. *Cf. Day v. Wooten*, 947 F.3d 453, 464 (7th Cir. 2020). However, it operates only in favor of defendants,

---

[5] The body of law Mr. Coleman must discount to argue that no analogous case exists is substantial. *See Scott v. Harris*, 550 U.S. 372, 379 (2007) (police acted reasonably in using deadly force to stop driver presenting "extreme danger to human life"); *Plumhoff v. Rickard*, 572 U.S. 765, 777 (2014) (holding driver's conduct "posed a grave safety risk" and police acted reasonably in using deadly force to end that risk); *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (granting qualified immunity over use of deadly force where driver engaged in high speed chase but driving was "relatively controlled"); *Scott v. Edinburg*, 346 F.3d 752, 760 (7th Cir. 2003) (affirming grant of summary judgment because officer's use of deadly force was reasonable to protect bystanders from reckless driving**).**

because only they benefit from an absence of precedent. *Cibulka*, 992 F.3d at 639–40 (admission that no relevant case existed was "fatal to plaintiff's attempts to overcome qualified immunity"). Leaving a precedential void, as Mr. Coleman seeks to do, accomplishes nothing for a plaintiff. *Id*.

Finally, Mr. Coleman's argument is unworkable because the qualified immunity inquiry does not require any party to identify a case litigating the exact scenario previously. *Howell v. Smith*, 853 F.3d 892, 897 (7th Cir. 2017) (plaintiff is not required to "point to a case on all fours with the defendant officer's misconduct"). It would make no sense to predicate the obviousness inquiry on whether an identical case had previously been adjudicated where the law has already acknowledged such a scenario's unlikeliness.

### (d) The right was not clearly established by precedent.

Finding that this does not present an obvious case, the Court turns now to the question of whether the right was settled law. Mr. Coleman identifies no precedent clearly establishing any applicable right and thus has failed to meet his burden. *See Purvis v. Oest*, 614 F.3d 713, 717 (7th Cir. 2010). Mr. Coleman also waived the argument that precedent clearly established a constitutional violation by failing to mention or adequately brief the argument in his response. *See Nichols,* 755 F.3d at 600 ("The non-moving party waives any arguments that were not raised in its response to the moving party's motion for summary judgment."). In the interest of completeness, the Court conducted its own review and is satisfied no precedent clearly establishing the unlawfulness of Officer Baker's conduct existed at the time of the injury. On the contrary, the available analogous precedent overwhelmingly found the officer's conduct did not consist of excessive force or afforded the officer qualified immunity. *See* cases cited *supra* note

5. An official does not violate clearly established law where no precedent suggests the conduct was unlawful and the available analogous precedent suggests the conduct was in fact lawful. *See Kemp v. Liebel*, 877 F.3d 346, 453–54 (7th Cir. 2017). Therefore, Officer Baker's conduct is entitled to qualified immunity under the second prong. *See McGreal v. AT & T Corp.*, 892 F. Supp. 2d 996, 1012 (N.D. Ill. 2012). As such, the Court grants Officer Baker's motion for summary judgment on Mr. Coleman's sole claim, excessive force.

### *(2) The use of force was reasonable.*

The Court now briefly addresses the first prong of qualified immunity: whether the use of force was excessive. *Pearson,* 555 U.S. at 236. Mr. Coleman's entire response brief addressed whether the violation was obvious under the second prong of qualified immunity; he did not make any argument regarding the reasonableness of the force employed. Therefore, he waived the argument that the use of force was unreasonable. *See Palmer v. Marion Cnty.*, 327 F.3d 588 (7th Cir. 2003) (citing *Laborers' Int'l Union of N. Am.v. Caruso*, 197 F.3d 1195, 1197 (7th Cir. 1999)). However, the Court will address the use of force on its merits. As stated above, Mr. Coleman has failed to point to authority establishing Officer Baker's conduct amounted to a violation. Indeed, he could not, because no constitutional violation occurred, as the danger presented by Mr. Coleman's driving justified Officer Baker's use of force. At least some of the shots, roughly three- or four-seconds worth, were fired before Mr. Coleman passed Officer Baker; these shots represent reasonable force to defend Officer Baker's own life and the lives of others around him. Those fired after protected only the other people in the immediate vicinity. Under guiding precedent, the entire use of force was reasonable because Officer Baker reasonably feared for his life and the lives of those in the immediate vicinity.

If lethal force is justified, the officer need not stop shooting until the threat has ended. *Plumhoff v. Rickard*, 572 U.S. 765, 777 (2014). However, officers do not have license to use deadly force indiscriminately as the threat of danger waxes and wanes. Instead, an officer may initiate deadly force when it is reasonable considering the threat and continue doing so until that threat has ended, either because the suspect is seized or because the nature of the threat has changed. In *Scott v. Edinburg*, our circuit separated the inquiry by who was endangered. 346 F.3d 752, 757 (7th Cir. 2003). In that case, the court found later shots must be reasonable in light of the danger the suspect posed to others, as the person seized no longer presented a threat to the officer's life. *Id*. Shots fired before Mr. Coleman passed Officer Baker can be analyzed in light of the danger posed to both Officer Baker and civilians, while those fired after he passed Officer Baker protected only civilians or other officers (as the threat to Officer Baker's life has dissipated).

Officer Baker's conduct before Mr. Coleman passed him was objectively reasonable under the circumstances. Officer Baker's use of force in shooting at Mr. Coleman was not excessive because he reasonably believed his own life was at risk. It is settled in our circuit that "when an officer believes that a suspect's actions place him, his partner, or those in the immediate vicinity in imminent danger of death or serious body injury, the officer can reasonably exercise the use of deadly force." *Muhammed*, 316 F.3d at 683. The Court assesses the question of reasonableness from the standpoint of a reasonable officer on the scene. *Finkley*, 10 F.4th at 738. "To appreciate that viewpoint, we consider what a reasonable officer in this case's circumstances knew and perceived." *Id*. Mr. Coleman's reckless driving presented a high level of danger to Officer Baker's life, and a reasonable officer in Officer Baker's position would have perceived extreme

danger to himself and others. Most significantly, Mr. Coleman drove his car in Officer Baker's direction at a high speed from a relatively close distance.

The threat was not insubstantial: Mr. Coleman was 300 feet away, traveling at 54 miles per hour, and swerving in a narrow street. (DE 141 at ¶¶ 56–57; 60.) When Officer Baker began firing at Mr. Coleman, Mr. Coleman's vehicle was only three or four seconds away from his position. Officer Baker's belief that his life was in imminent danger is clearly reasonable. *See Scott v. Edinburg*, 346 F.3d at 757. Moreover, a reasonable officer would have had additional reasons to believe Mr. Coleman presented a danger to his life given the prior events of the evening. An officer in Officer Baker's shoes would have heard dispatch describe a maroon SUV driving recklessly and nearly hitting a pedestrian. It is reasonable to fear an SUV driving rapidly and erratically toward oneself; it is more reasonable yet when one is informed about a prior near miss. *Cf. Horton*, 883 F.3d at 950 (considering officer's prior knowledge of armed suspect when finding officer's conduct reasonable). Here, it is clear the reasonably perceived danger to Officer Baker's life was imminent and sufficient to justify deadly force. Therefore, Officer Baker did not use unreasonable force in shooting at Mr. Coleman as he drove erratically in his direction at a high speed.

The use of force after Mr. Coleman passed Officer Baker was also reasonable because the lives of others in the immediate vicinity were in imminent danger. These shots must be justified based on risk to others alone, as the risk to Officer Baker had dissipated. This is a fact-intensive inquiry based on the modicum of reckless driving and the surrounding circumstances. *Brosseau v. Haugen*, 543 U.S. 194, 201 (2004). To justify deadly force, the risk to others must be actual and imminent. *Scott v. Harris*, 550 U.S. at 384. Notably, the area was full of police officers and

19

civilians, with more people located just half a block—or about four seconds—away.[6] The danger posed to these people was sufficiently actual and imminent to justify deadly force under our case law, as the magnitude of danger was equal to prior cases and the presence of third parties was more concrete. *See Mullenix*, 577 U.S. at 14 ("In *Brosseau* itself, the Court held that an officer did not violate clearly established law when she shot a fleeing suspect out of fear that he endangered "other officers on foot who she *believed* were in the immediate area, the occupied vehicles in his path, and any other citizens who *might* be in the area.' 543 U.S. at 197. The threat [plaintiff] posed was at least as immediate as that presented [in *Brosseau*]") (emphasis original). The Court further notes the presence of third parties was not hypothetical; their presence in the direction of Mr. Coleman's path presented real danger arguably greater than that previously found to justify use of deadly force. *See Scott v. Edinburg*, 346 F.3d at 759 (nearby people need not be in the direct path of the car to be in imminent danger; they can be in the immediate vicinity of the car); *Scott v. Harris*, 550 U.S. at 384 ("respondent posed an actual and imminent threat to the lives of any pedestrians *who might have been present*, to civilian motorists, and to the officers involved in the chase"); *Ybarra v. City of Chicago*, 946 F.3d 975, 980 (7th Cir. 2020) (use of deadly force reasonable where reckless driver endangered "pedestrians, cyclists, and other vehicles *in the area within twenty minutes of the incident*"). While Mr. Coleman ultimately posed no threat to those pedestrians located in the next intersection (as he promptly crashed his car into a tree), Officer Baker would not have known that at the relevant time. *Horton*, 883 F.3d at 951. Therefore, Officer Baker did not act unreasonably in exercising deadly force to protect the lives of innocent bystanders. The Court's further discussion of excessive force should be read

---

[6] The intersection of Rose St. and Pleasant Ave. is about the same distance from Officer Baker's position as the intersection of Holliday St. and Pleasant Ave., the point where Officer Baker began firing. Rose and Holliday bookend the 400 block of Pleasant Ave., where the relevant events take place.

not to undermine its finding of qualified immunity but to rebuke Mr. Coleman's untenable position that the Constitution requires an officer to tolerate imminent risk to his life and the lives of others.

**E. Conclusion**

Accordingly, the Court GRANTS Defendant Officer Baker's Motion for Summary Judgment on Mr. Coleman's single excessive force claim. The Court ORDERS the Clerk to prepare a judgment.

SO ORDERED.

ENTERED: January 3, 2023

_____/s/ JON E. DEGUILIO_____
Chief Judge
United States District Court